here, the argument we make about invited error. I think that Mr. Zegas is really sort of struggling to find something in those 10 pages of deposition that his client actually disagreed with at trial. I mean, when you look at the closing arguments, it was readily apparent that there were fraud here, and that was part of defense counsel's closing. Of course, these loans were fraudulent. The question was whether or not Ms. Paling knew. If you look at the 10 pages that the government sought to put in, the testimony was very, very limited. And let me explain again the context. For this particular real estate transaction, there were two separate closings. The seller and the buyer met separately with Ms. Paling. They didn't meet all together. So first you had testimony from Danielle Ferrazano and Sandra Minardi, who were at the one side. For the second side that Mr. Velarde participated in from the buyer's side, he was the only one in the room. So this was really the only evidence that the government had to show that Ms. Paling actually did that. It ended up not being in dispute at the trial that she did those. In fact, when her witness, Mr. Blanche, she called as a witness to testify, he verified that Paling did all of these closings except for the one Florida transaction. So we were putting this into dot I's and cross T's. Again, if you read those 10 pages, it basically says Paling handled the closing. She put a lot of papers in front of me. She asked me to sign them. I signed them. Then what appears to be the case is that defense counsel thought it was to his advantage to put in the testimony where Mr. Velarde was confused initially and started to say that he thought he got a check that, in fact, he never got. Well, Minardi had testified that it had been shredded, and I don't want to confuse it. There's another check that was shredded as well from Mr. Henry, but that's not this particular one. So that is not something that we tried to get in to verify her testimony. It ended up verifying because eventually he came around and said, oh, yeah, I didn't get that check. So we were able to use it, but it wasn't part of our intention. So it clearly is invited error here. The real question is what was his motive to cross-examine Velarde on? Before we move from that, Mr. Zegas pointed out that they objected in the first instance of the whole thing. Could it be invited error? I mean, they were trying to cover themselves, I guess. After they objected, they knew that it was going in, and so they put in extra testimony. I would agree with you, Your Honor, if what they put in, in fact, somehow was meant to undermine the part that we put in. But the part they put in, they were putting in for their own purposes. They put it in because they wanted the part where Mr. Velarde said, I think I got that check. Now, that didn't rebut anything in the first ten pages. So you can imagine a situation where they have to put in some harmful stuff to sort of undercut his credibility, but they weren't trying to attack his credibility on that point. And I think the starkest example of that, you can see there were two other buyers that we put in during the course of the trial. There was Mr. Cumberbatch and Mr. Petito. And look at the cross-examination that was conducted on them. It wasn't the theory of the case to say that these particular, I'm sorry, these are sellers, not buyers, that these sellers were liars, that they, you know, that they were coming in and misrepresenting what had happened. The theory of the case was that there was this massive criminal fraud and the other three people, Mainardi and Vella and Verdia, were the ones involved. But she was just a dupe. She didn't understand. And again, there's nothing in that testimony in those ten pages that you would want to cross-examine Mr. Velarde for if you had him there. It was uncontested parts of the record. If we had known that Mr. Blanche was going to be a defense witness, we wouldn't have needed to call or put in Velarde's testimony. Let me ask you about that, because in your brief you're suggesting that, well, Velarde's testimony really wasn't that pertinent. Anyhow, and I began wondering, well, if it's not that pertinent, then why put it in? Yes. See, we didn't know ahead of time that when you look at the closing documents from that half of the closing, Ms. Poehling signed Blanche's name on all the documents. So if you just look at the face of the documents, you don't even know that Ms. Poehling was there. So in those ten pages of testimony, you find out for the first time that, in fact, she conducted that closing. It ended up not being in dispute at the trial in the end. Her witness said that except for the Florida closing, that she did all of those, and he had authorized her to do it. So if this isn't a harmless error, I think it's invited error. But if it's not invited error, it's certainly harmless error. Just, I mean, I'd be remiss if I didn't talk a little bit about the strength of the evidence. And the first thing that I found out, which is in the transcript, is that the jury received this, well, the jury deliberated for two hours and 15 minutes in this case, and that's including- How long was the trial? I'm going to get that one wrong. Two weeks. Yeah. Okay. Thank you, Judge Chigarris. It's about two weeks. The jury deliberated for two hours and 15 minutes. That's including lunch, which they ordered at the beginning. So they really didn't have a lot of trouble with this, but let's talk about the strength of the evidence. We have two witnesses who testified that Ms. Poehling shredded checks in addition to Maynardi. Now, Robert Henry did not testify that he saw her shred a check, but he testified that she told him not to worry about the check because it was going to be shredded. So we have Susan Maynardi-Sandra Maynardi, I'm sorry, saying that she saw the shredding, and we have one witness who said that he was assured that it would happen. But there's so much else going on here, too. She's the one who's making all the payments with this money, and she's making lulling payments for all of these. The idea is that if these loans go bad immediately, then the jig is up, and they're not going to be able to collect their money, and the whole deal is going to be rescinded. So for six months after each of these loans, she's sending checks and paying the mortgage on these transactions that are already closed. So there's no good explanation for that. Mr. Morimarco, Mr. Morimarco, I know that you would like to say a lot more, and I would like to hear you say a lot more for a lot of reasons, but the chief judge sent you a statement to the admitted civil deposition testimony, and I would suggest that I think you're going beyond that at this point. Oh, and I'm happy to sit down, and I'm happy to address the Confrontation Clause as well. I think you have, really. I thought you were adding the evidence in terms of your harmless error argument. Yeah, I mean, I appreciate your point, Judge Garth, that we were directed to limit ourselves to the Confrontation Clause. I guess I had suggested in my brief that the best way to approach the Confrontation Clause argument was to avoid it entirely. So perhaps that, you know, and just do this on the basis of prejudice. Our position on the Confrontation Clause, just so you know, is that, in fact, it is more, or that the rule of evidence is more restrictive than the Confrontation Clause, that the clause itself just requires an opportunity for cross-examination. It's the rule that requires a similar motive, and here we think it's, well, again, I don't want to address the rule if the Court is only interested in the Confrontation Clause, but clearly if the Confrontation Clause standard is just opportunity, then there was an opportunity here because Poehling's attorney took this deposition, which goes on for several hundred pages, and frankly, if you look at the deposition Well, Poehling's attorney wasn't her attorney, really. It was the insurance company's attorney, and the attorney represented Poehling and someone who became a court defendant. Yeah, well, that was the issue that the District Court actually did reach in its decision. That was the principal argument that was made to the District Court about why the motives were dissimilar, and they were saying, well, we can't tell from this record whether or not this attorney was even interested in Poehling. What I would point out is, hey, that is an issue that you do have a finding on. That is where the judge explicitly said, I don't agree with Mr. Colasanti. When I look at this transcript, he does seem to be focusing on Ms. Poehling's conduct, and we would say she was his agent, so clearly the rule which requires a similar motive doesn't require identical motive, but they were going to rise or fall together in that civil case, and certainly the insurer was going to be responsible for anything that she did as the closing agent for that attorney. So I think those motives are closely aligned. But Mr. Zagisman has a good point distinguishing between negligence and fraud. If it's only negligence, and if her motive is to concede those acts which would constitute negligence because then there's coverage, that is a decent argument, it seems to me. Well, I don't think negligence – I mean, they certainly have an interest in disproving fraud, which was one of the allegations in the complaint, so they're not – I think the interests are aligned. I'm not really sure what negligence – But you could admit to something which would be negligent and still contest that it's fraud. There's no center. Well, wouldn't that – it's not fair for me to ask the question, but it seems to me that if they were negligent or intentional, they would lose the civil case, and only if they were intentional – intentionally fraudulent, they would lose the civil – the criminal case. So they have an incentive in the civil case to have those frauds. Okay. I thought, Mr. – and I was taking this representation that the policy only excluded – they were covered unless it was fraud. Oh, I don't think there's anything in the record about the policy, certainly not that I'm familiar with, and there's nothing in the record that I'm familiar with that says whether or not there was a waiver of any potential conflict. I think that's just outside the record. But that was the issue that the district court did reach and suggested that he thought that their interests were aligned in that particular aspect. You know, I brought to this court's attention on the Confrontation Clause issue, the very old Supreme Court case which we think suggests that really opportunity is enough rather than – that's California versus Green. There certainly are a number of cases both within this circuit – well, no, there are not a lot of cases obviously within the circuit. There are a lot of – I said on page 23 of my brief three or four circuit decisions in which civil depositions were used under the rule. And obviously, if the rule is more restricted than the Confrontation Clause, then of course that would be permissible. I mean, I really – I'm happy to sort of rest on my briefs for the remainder of my argument. But I would like to address the Confrontation Clause argument to the extent the panel has any questions about whether the government's position is applying it properly or really if there was something that prompted that restriction to the Confrontation Clause that the panel is uncomfortable with, I'm happy to address that. Did the district court really consider the similar motive? Well, I argued that it was implicit, Judge Shigaris, and frankly, it was not the opinion that we were looking for in terms of the clarity. What I would say in Judge Sheridan's defense is he addressed it in the manner that it was directed to him. If you look at the argument, the only aspect of motive that was addressed during the oral argument portion was this, you know, was the attorney really representing her or was the attorney interested in representing other people instead. So he did discuss that when he made his ruling. But mostly he focused on the Confrontation Clause and he focused on the opportunity and the unavailability of the witness, which, again, he could have expanded more. And I'm sure if Mr. Zegas had been in front of him, he would have gotten more or objected more at the point. I mean, we make an argument that it would have been proper for the defendant at that point where at the end of the argument he says any questions to the judge. He could have said to the judge, Your Honor, you haven't addressed the rule. You've only addressed the Confrontation Clause. That would have given the judge an opportunity to clean that up right then and there if, in fact, he had considered it as he suggested he had. There's certainly, again, it's more implicit than explicit, but I do think it was at least minimally addressed. Anything else, Judge Garrett? Nothing further. Thank you, Your Honors. Thank you. I will speak very quickly. First let me address a misunderstanding I had when Your Honor asked earlier about whether the same attorney was named as co-conspirator. I didn't realize what Your Honor was asking. I think you're asking, consulting with my adversaries, whether Mr. Hughes who had been doing this. I misunderstood that. Mr. Blanch and Ms. Paling were both represented by the same attorney, and that is what I submit as a conflict. I also submit that under New Jersey law, you can't have insurance coverage for fraud, for an intentionally fraudulent act. So there was a conflict of interest between the two. There are claims that Ms. Paling had signed checks of Mr. Blanch without right to do so. That, too, shows that there's inherent conflict between the two in the context of these closings. And with respect to whether motive was considered by the district court, just as Your Honors were asking in the case preceding ours, the judge never explicitly ruled on that aspect of the argument. There's nothing we found. The judge found that, in fact, the witness was unavailable. There's no contesting that. But there was no finding made as to whether the motive existed at the deposition for Ms. Paling to have questioned in the way that he would have had he been in a criminal proceeding, or whether the motivation to do so in the civil setting given the claims that existed. I think it was Ms. Paling's interest to see that the claims were confined to negligence and the acts were seen as negligent. And if she's showing documents quickly without explanation, that can be viewed as an act of negligence covered under the policy, whereas in the criminal context, those very same acts could be looked at as fraudulent. The closing agent is quickly showing the documents to the seller in order to have them signed without knowing the reality of his transaction. So that will conclude my argument. I appreciate your time. And, Judge Garth, I wish you the very best. I remember giving you rides back from Philadelphia at times with Judge Tarrakin. Thank you. I always admired you, and I really do wish you the very, very best. Thank you. Thank you. He'll still be actively involved with us. His public face will become a little less visible, but he'll still be involved with us. Thank you. Take matter into advisement and you can reset. Judge Garth, I'll call you from my chambers to confer. I'll wait here to hear your call. Okay, great. Thanks. Yeah.